Paul T. Trimmer
Nevada State Bar No. 9291
Lynne K. McChrystal
Nevada State Bar No. 14739
**JACKSON LEWIS P.C.**
300 S. Fourth Street, Suite 900
Las Vegas, Nevada 89101
Tel: (702) 921-2460
Fax: (702) 921-2461
Email:  paul.trimmer@jacksonlewis.com
Email:  lynne.mcchrystal@jacksonlewis.com

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| Eugene Scalia,<br>Secretary of Labor,<br>United States Department of Labor,<br><br>Plaintiff,<br><br>vs.<br><br>Unforgettable Coatings, Inc., a Nevada Corporation; Unforgettable Coatings of Idaho, LLC, dba Unforgettable Coatings, a Nevada Limited Liability Company; Unforgettable Coatings of Arizona, LLC, dba Unforgettable Coatings, an Arizona Limited Liability Company; Unforgettable Coatings of Utah, Inc., dba Unforgettable Coatings, a Utah Corporation; Shaun McMurray, an individual; Shane Sandall, an individual; Cory Summerhayes, an individual<br><br>Defendants. | Case No.: 2:20-cv-00510-KJD-BNW<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATIONS FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION** |

Defendants Unforgettable Coatings, Inc., Unforgettable Coatings of Idaho, LLC, dba Unforgettable Coatings, Unforgettable Coatings of Arizona, LLC, dba Unforgettable Coatings, Unforgettable Coatings of Utah, Inc., dba Unforgettable Coatings, Shaun McMurray, Shane Sandall, and Cory Summerhayes [sic] (collectively "Defendants," or "UCI"), by and through its counsel, hereby oppose Plaintiff's Applications for Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue (ECF Nos. 4, 5).

Plaintiff's Applications, which are duplicate filings, are premised on false allegations and a manufactured theory of retaliatory conduct advanced in blind ignorance of the current economic crisis. The "evidence" presented in the Applications consists of hearsay, double hearsay,   an unsigned declaration, an inaccurate and uncertified translation, and a selective extract of payroll records. These are misleading and fail to satisfy Plaintiff's burden in order to obtain the extraordinary remedy of injunctive relief at this stage of the proceedings.   Indeed, the Applications were filed mere days after counsel for Defendants accepted service of the Complaint and are supported by a misleading characterization of the notice provided to Defendants. Furthermore, Plaintiff's requested relief is extremely overbroad, premature, and unwarranted in light of the circumstances, yet also lacks the appropriate level of specificity in key areas as it purports to include all employees of Defendants, and does not differentiate between any of the 4 named corporate defendants or any of the 3 named individual defendants. Finally, there is no justification for Plaintiff's request for an award of fees and costs.  To the contrary, Defendants should be awarded their fees and costs for responding to Plaintiff's manufactured Applications. Therefore, Defendants request that this Court deny Plaintiff's Applications in their entirety.

This Opposition is made and based upon the accompanying Memorandum of Points and Authorities, the exhibits attached hereto, all pleadings and papers on file herein, as well as any oral argument that this Court may entertain.

Dated this 17th day of April, 2020

JACKSON LEWIS P.C.

*/s/ Paul T. Trimmer*
Paul T. Trimmer, State Bar No. 9291
Lynne K. McChrystal, State Bar No. 14739
JACKSON LEWIS P.C.
300 S. Fourth Street, Suite 900
Las Vegas, Nevada 89101

Attorneys for Defendants

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

Temporary restraining orders are appropriate only in extraordinary circumstances.   The Plaintiffs' application for a temporary restraining order and preliminary injunction in this case is based on (as set forth below, completely false) allegations of recent misconduct – the alleged termination of unspecified and unidentified individuals – combined with additional allegations about witness intimidation based on a memo which was sent in October 2019.   The support for these allegations consists of three declarations, scotch taped together and imbued with meaning by opposing counsel's overheated speculation and characterizations.

Neither the declarations nor opposing counsel's theorizing holds up when confronted by the facts, however.    **All** of the material allegations in those documents are unattributed, uncorroborated hearsay or double hearsay, and while such otherwise inadmissible evidence can be considered when a TRO application is filed, they cannot be "conclusory and without sufficient support in facts."   *American Passage Media Corp. v. Cass Comm.*, 750 F.2d 1470, 1473 (9th Cir. 1985).   The problems with Plaintiff's declarations cannot be cured.

- Cristian Cespedes' Declaration is not signed.   Docket No. 4-4.   His employment with the Company ceased in September 2019, months before any of the alleged events relevant to the TRO application supposedly took place.   *Id.* at ¶ 2.   His statements and characterizations of the contents of the September 2019 letter are inconsistent with the actual text of the document, barred by the best evidence rule, and based on unattributed hearsay.   *Id.* at ¶ 6.   His statements about paystubs and workers' alleged fear are hearsay, not specific, and unattributed.

- The declaration of Daryl Davis-Ferra suffers from the same problems.   His statements about the September 2019 letter are inconsistent with the text, barred by the best evidence rule, filled with speculation, and contain legal conclusions (i.e., that advising employees that participation in interviews is voluntary "deter[s]" workers).   Docket No. 4-6 at ¶ 7.   Similarly, his assertion that the letter constitutes "witness intimidation," *id.* at ¶ 10, is not evidence.   It is speculation and characterization, and

his supposed "translation" of the letter is materially inaccurate.  His statement about paycuts and terminations, *.id.* at ¶ 24, is rank, unattributed hearsay, and there is no reason for the lack of attribution given that he does not say it is based on the statement of an allegedly confidential informant.

- The declaration of John Lama, Docket No. 4-9, is also nothing more than hearsay when it comes to the testimony relevant to the TRO.  Each paragraph is based on unattributed statements of "workers," without information about the date the conversations allegedly occurred, without corroboration from redacted notes, without support from redacted communications.  His testimony about the alleged terminations, *id.* at ¶ 13, is based on **double hearsay** from workers claiming that other workers had been discharged.

Based on the foregoing evidence, Plaintiff asked the Court for extraordinary relief.  It asked the Court to preclude the Company from discharging or otherwise laying off **any** worker at the Company unless it first contacts the employee and the DOL and provides a reason.  Docket 4-10 at ¶ 2.  It asks for premature discovery related to the merits of Plaintiff's FLSA claims, discovery which has nothing to do with the issues supposedly warranting a TRO.  *Id.* at ¶¶ 3, 5.  And it asked for an order enjoining Defendant from doing things that Defendant has not done and which Plaintiff has not come close to proving, including witness tampering, and suborning false testimony.  In short, the Plaintiff's application contains no evidence.  It certainly has not shown that it is likely to prove, by a preponderance of the evidence, that it would succeed at trial in proving that the Defendant has engaged in retaliation and other acts prohibited by the FLSA.

Simply put, the facts set forth in the DOL's application are materially and inexcusably false.  No employees have been terminated.  *See* **Exhibit A**, Declaration of Cory Summerhays ("Summerhays Decl.").  All of the employees – including any employee to whom the DOL could have conceivably referred – remained on payroll through April 3, 2020, receiving pay as if they had worked full 40 hour weeks.  Those same employees are still on payroll, and received full paychecks after the TRO was issued, even though the Company was shut down for COVID-19 cleaning.  And, throughout this period, the Company has continued to pay for all employees'

1  health benefits, with no cost to the employees.  To the extent employees may have been confused

2  about whether they remained employed after they placed themselves in jeopardy by walking off

3  the job on March 18, 2020, that confusion was cleared up no later than March 24, 2020 – more

4  than a week before the DOL filed its TRO application.  *See* **Ex. A**, Summerhays Decl.

5       The Applications allege intermittent conduct of Defendants dating back to 2013, yet the

6  entire basis for injunctive relief boils down to one bald accusation: that, in March of 2020,

7  Defendants informed employees of a pay reduction due to the pandemic and terminated

8  employees who complained.  ECF No. 4 at 2:20-22.  Plaintiff goes so far as to accuse Defendants

9  of "using the pandemic…as a cover" for retaliation, ECF No. 4 at 1:7-8, despite Plaintiff's

10  complete ignorance of Defendants' financial state and business operations.  Plaintiff's overly

11  simplistic explanation for why Defendants' legitimate business decisions must be "cover" for

12  retaliation is this the Governor has deemed construction to be an essential business, therefore

13  Defendants' operations must be proceeding as if nothing had changed.  Plaintiff's assumption that

14  Defendants' operations are proceeding as usual in the midst of the worst economic downturn

15  since the Great Recession is astonishing and unsupported by a single piece of actual evidence.

16       Had Plaintiff not filed its application prematurely and without reasonable notice to

17  Defendants, Defendants could have explained that its volume of business was already at its lowest

18  point in ten years *prior* to the COVID-19 outbreak and *prior* to the filing of the Complaint. When

19  the COVID-19 crisis deepened, several of Defendants' customers either cancelled work entirely

20  or requested Defendants to delay performance. Further, Defendants could have explained that it

21  did not in fact terminate any employee after March 18, 2020, but that some employees have been

22  unable to work (but remain on payroll with full health benefits) because there is simply no work

23  for them to do. Defendants now present both of these points to the Court, with the proper factual

24  support that Plaintiff's allegations lack.

25       There is no merit to Plaintiff's allegations, Defendants respectfully request that this Court

26  deny Plaintiff's Applications in their entirety.

27

28

## II.   **STATEMENT OF FACTS**

UCI is a commercial and residential painting contractor with approximately 90-100 full-time employees in Nevada. **Ex. A**, Summerhays Decl., ¶ 3.  For the past several years, it has been able to consistently provide a full 40 hours of work to its employees and schedule jobs 4 to 6 weeks out. *Id.* In December 2019 and January of 2020, UCI began to have difficulty filling its schedule 4 to 6 weeks out.  *Id.* at ¶ 4; **Exhibit B**, Declaration of Justin Swenson ("Swenson Decl."), ¶ 4. In fact, Justin Swenson ("Mr. Swenson"), the General Manager for Production, had never seen UCI's schedule so scarce in his 10 years' experience working for the company.  *Id.* at ¶ 6.  Mr. Swenson, who bears primary responsibility for monitoring workflow and labor needs for UCI, began to worry and press the sales staff to generate more work.  *Id.* at ¶¶ 3, 5.  Mr. Swenson sent text messages in December 2019, January 2020, and February 2020 wherein he expressed his concerns, such as "I have zero work for guys.  Every job is doubled up" and  "we are running out of work again." *Id.* at ¶ 5. Despite the increased pressure Mr. Swenson placed on the sales team, the best they could manage in the first quarter of 2020 was to schedule employees 1 to 2 weeks in advance (although a few employees on larger projects had steady work scheduled for 4 weeks). *Id.* at ¶ 6.

Mr. Summerhays also noticed the scarcity of work.  He felt that the he schedule for March 2020 was the least full it had been in the company's history.  **Ex. A**, Summerhays Decl., ¶ 4.  He discussed these issues with UCI's Vice President of Sales, Mike Lawruk ("Mr. Lawruk") in early March 2020.  Mr. Summerhays and Mr. Lawruk discussed the "gaps" they saw in the schedule and attempted to utilize days off to stall and hope that more jobs would be forthcoming. *Id.*  They further discussed the major concerns they had about the company's projections for the next 6 months to 1 year even prior to the Governor of Nevada's announcement.  *Id.*

The slowing of UCI's volume of worsened when business began to close due to COVID-19.  **Ex. B**, Swenson Decl., ¶ 7.  The schedule for March 2020 was the least full it had been in the company's history.  *Id.* at ¶¶ 6, 8. Although the Governor of Nevada (and the governors in other states where Unforgettable operates) deemed construction an essential business when announcing statewide closures, COVID-19 impacted *customer* demand and budgets.  **Ex. A**, Summerhays

Decl., ¶ 6; **Ex. B**, Swenson Decl., ¶ 7. For instance, on March 18, 2020 a customer at Stone Ridge HOA requested that UCI delay performance of a job. *Id.* She explained "[i]n light of the news announcement last night and controlling spread of COVID-19, please reschedule painting at Stone Ridge. There are many seniors within the community. Painting wrought iron railings is not worth risking their lives. It can be delayed." *Id.* On March 26, 2020, Mr. Swenson texted Sales Account Executive Clayton Peterson ("Mr. Peterson") and told him "I'm gonna have guys out of work Monday." *Id.* Customer demand weakened further as the crisis deepened, and even larger projects were impacted. **Ex. A**, Summerhays Decl., ¶ 19. For instance, on March 26, 2020, UCI received a letter from Nigro Construction, Inc., stating that the Mountain West Industrial project was on hold. *Id.* (Ex. 5). This project is for a large industrial park in Las Vegas and would have provided a significant amount of work for UCI. *Id.* As recently as April 9, 2020, ColRich canceled a $525,000 contract to paint the Emerson Apartments in Herriman, Utah. *Id.* (Ex. 6).

After reviewing the financial projections for the company into the remainder of 2020, Mr. Summerhays reluctantly decided that a company-wide reduction in discretionary bonus pay would potentially be necessary to maintain the company's financial health, align with estimates of future profits, and ensure the continued employment of its employees. *Id.* at ¶ 7. On March 18, 2020, Mr. Summerhays held a meeting with the company's foremen. *Id.* at ¶ 8; **Exhibit C**, Declaration of Angel Perez ("Perez Decl."), ¶ 4; **Exhibit D**, Declaration of Archi Esteban Romero ("Romero Decl."), ¶ 5). He explained that work had slowed over the past several weeks, and that with the state's order requiring non-essential businesses to shut down, the company may have even less work. *Id.* He said that he wanted to keep all employees working, even if that meant that everyone would have to make a little bit less. *Id.* He said that UCI may have to reduce discretionary bonus pay by up to 30%, but that he would not know the exact amount. *Id.* He explained that either everyone had to take a little bit less or the company could run out of money, but that all employees would continue to receive 100% of their health insurance coverage during this period. *Id.* Mr. Summerhays asked the foreman to raise their hands if they understood and agreed with this. **Ex. A**, Summerhays Decl., ¶ 8. All foreman present raised their hands. *Id.* Mr. Summerhays

then instructed the foreman to disseminate the information to their teams of workers. **Ex. A**, Summerhays Decl., ¶ 8; **Ex. C**, Perez Decl., ¶ 5, **Ex. D**, Romero Decl., ¶ 5.

A small group of workers reacted to the news with threats and ridicule when their foreman, Angel Perez ("Mr. Perez"), announced the potential reduction in discretionary bonus pay during an on-site meeting with his team[1] at the Acacias HOA in Henderson, Nevada. **Ex. C**, Perez Decl., ¶ 5, **Exhibit E,** Declaration of Iris Jasmin Martinez ("Martinez Decl."), ¶ 5. One worker told  Mr. Perez that he would "kick his ass." **Ex. C**, Perez Decl., ¶ 5. This group grew angry with Mr. Perez, told him they did not believe that everyone, including Mr. Perez, would be required to take the reduction, and demanded to talk to Summerhays.  *Id.* at ¶¶ 5-6, **Ex. E**, Martinez Decl., ¶ 4.   Mr. Perez called Mr. Summerhays and put him on speakerphone so the group of workers could talk to him. *Id.*  Mr. Perez told Mr. Summerhays that people on his team did not believe him when he announced the potential reduction in discretionary bonus pay, and that they wanted to hear the news directly from Mr. Summerhays. **Ex. A**, Summerhays Decl., ¶ 9, **Ex. C**, Perez Decl., ¶ 6.   Mr. Summerhays told the group of workers that Mr. Perez was correct. **Ex. A**, Summerhays Decl., ¶ 9, **Ex. C**, Perez Decl., ¶ 6; **Ex. E**, Martinez Decl., ¶ 5.  He explained that the situation was serious, and the step was necessary to ensure that every employee was taken care of.  *Id.*   The group of workers replied to Mr. Summerhays that he could come and "clean [his] own building" (i.e. finish the project at the Acacias himself). **Ex. E**, Martinez Decl., ¶ 5. They laughed and hung up. *Id.* One employee told Mr. Perez that he would go to the labor commissioner and Mr. Perez responded that it was okay if he wanted to go. **Ex. C**, Perez Decl., ¶ 7. Several employees then left the jobsite. **Ex. C**, Perez Decl., ¶ 8; **Ex. E**, Martinez Decl., ¶ 6. They did not ask for Mr. Perez's permission to leave. **Ex. C**, Perez Decl., ¶ 8.  They appeared angry and did not say that they intended to return to work.  *Id.*

At no point during the discussion with Mr. Perez, or with Mr. Summerhays on the speakerphone, did any of the employees express fear to work due to COVID-19 or request to stay

---

[1] At the time Rafael Castillo Dubon, Jose Adolfo Ganez Dubon, Abraham Gonzales Mendoza, Denis Guardado, Iris Jasmin Martinez, Melvin Antonio Martinez Ramos, Oscar Abel Serrano Alfaro, and Oscar Zuniga were members of Mr. Perez's team. **Ex. A**, Summerhays Decl., ¶ 13, **Ex. C**, Perez Decl., ¶ 5; **Ex. E**, Martinez Decl., ¶ 3.

home during the duration of the outbreak.[2] **Ex. A**, Summerhays Decl., ¶ 9, **Ex. C**, Perez Decl., ¶ 8; **Ex. E**, Martinez Decl., ¶ 7. Some employees did not report to work the next day even though they were scheduled to do so.  **Ex. A**, Summerhays Decl., ¶ 9.

On March 22, 2020, a few days after the announcement regarding the potential reductions in discretionary bonus pay, UCI had received additional cancelations from customers, still did not have a full schedule of work for all employees, and had some employees walk off the jobsite.  *Id.* at ¶ 10. Mr. Summerhays therefore directed Galia Carrejo ("Ms. Carrejo") to message a number of workers throughout the Company, including several in Mr. Perez's group, informing them that no work was available at that time, and that the Company would therefore assist them with severance while they were out of work. *Id.*; **Exhibit F**, Declaration of Galia Carrejo ("Carrejo Decl."), ¶ 12. Those individuals who walked off Mr. Perez's jobsite and did not return were among those advised of the lack of work, as was Edgar Ortiz, who was not part of Mr. Perez's group.  **Ex. A**, Summerhays Decl., ¶ 10; **Ex. F**, Carrejo Decl., ¶ 12.

However, it came to Mr. Summerhays' attention that this message confused some workers because they believed that the message was a permanent termination from the Company. **Ex. A**, Summerhays Decl., ¶ 11.  The allegation that UCI terminated these employees is false.  *Id.* at ¶ 12.  None of those workers were terminated.  *Id.* at ¶ 12; **Ex. F**, Carrejo Decl., ¶ 14. Although Mr. Summerhays had considered taking action against the workers who directed outbursts to Mr. Perez, he ultimately chose not to do so because COVID-19 has had such a dramatic effect on people and he believed many of the employees simply could have been caught up in the moment. **Ex. A**, Summerhays Decl., ¶ 12.  Mr. Summerhays instructed Ms. Carejo to send follow up messages to let these employees know that he (Mr. Summerhays) would contact them later that day. **Ex. F**, Carrejo Decl., ¶ 13. Mr. Summerhays therefore contacted workers personally to clear up any misunderstandings. **Ex. A**, Summerhays Decl., ¶ 13.  Beginning on March 24, 2020, he called each worker individually – Rafael Castillo Dubon, Abraham Gonzales Mendoza, Dennis

---

[2] The version of this meeting as recounted by investigator John Lama ("Mr. Lama") in Plaintiffs' Applications is inaccurate and misleading.  *See* ECF No. 4-9, ¶¶ 13-14. It is based on hearsay and directly contradicted by statements attached to this Response.

Valdez, Jose Ismael Zuniga, Melvin Antonio Martinez Ramos, Ramon Salgado, Oscar Abel Serrano Alfaro, Angel Diaz, Oscar Zuniga, and Edgar Ortiz, to explain that they were not terminated, would be scheduled for work as soon as work was available, and would continue to receive 100% of their health insurance and dental premiums. *Id.* Mr. Summerhays was unable to speak to one employee, Oscar Abel Serrano Alfaro, but it was not for lack of trying. *Id.* at ¶ 14. Mr. Alfaro would not return his call. *Id.*

Since that time, Mr. Summerhays has continued to check up on employees and communicate with them regarding the availability of work and their continued employment with UCI. *Id.* at ¶ 15. For instance, Mr. Summerhays had text conversations with Dennis Valdez, Abraham Gonzales Mendoza, and Melvin Antonio Martinez Ramos. *Id.* at ¶ 16 (Ex. 3). Mr. Summerhays and these employees discussed UCI's continued provision of health benefits to each employee (at no cost to the employee) and the availability of work. *Id.* These text message exchanges occurred well before the Department of Labor filed its application for TRO. *Id.* In fact, on April 4, 2020, Mr. Mendoza expressed his gratitude for maintaining his pay although he had not worked a full schedule and stated "now I can pay my bills thanks again…." *Id.* On April 5, 2020, Mr. Summerhays replied with a text to Mr. Mendoza explaining that UCI has had employees without work for awhile, and that "[e]ach individual is being considered for work, trying to spread that out as much as possible considering the lack of work." *Id.* UCI has since arranged for Mr. Mendoza to start a project in Utah beginning the week of April 20, 2020. *Id.*

Further, all of the individuals who were on Mr. Perez's team on March 18, 2020, were paid for forty (40) hours per week in the payroll cycle that ended on March 27, 2020, even though some of them did not work at all. *Id.* at ¶ 17 (Ex. 4). UCI processed payroll on April 17, 2020, for all of its employees, including those employees who are not currently scheduled to work. *Id.* at ¶ 18.

UCI's operations continue to be hampered by the COVID-19 crisis. *Id.* at ¶ 19. The company recently closed its job sites and hired a third party to perform COVID-19 specific cleaning for worker safety. *Id.* at ¶ 20 All employees we paid during this period of time. *Id.* It has equipped its foremen with infrared thermometers to monitor employee health. *Id.* Any

workers who exhibit symptoms of COVID-19 are required to go home with full sick pay. *Id.* Nonetheless, UCI's precautions cannot bolster flagging customer demand or create work where there is none. *Id.* at ¶ 21. Some employees still have not been scheduled for work simply because no work is available. *Id.* But, as noted above, UCI is continuing to pay those individuals and is continuing their health benefits. *Id.*

Clearly, UCI's announcement of a potential reduction in discretionary bonus pay was based on a legitimate business purpose. There is no evidence that any of its actions were linked to the filing of the instant Complaint. There is no evidence that it terminated any employees for complaining about the potential reduction, because it did not terminate any employees even though a group treated their foreman discourteously and walked off the job. The remainder of the allegations in the Applications attempt to fabricate "irreparable harm" in the form of intimidation based on statements allegedly made by Mr. Summerhays in various meetings. Notably, the only "evidence" offered by Plaintiff to prove Mr. Summerhays made the various inflammatory statements they accuse him of are declarations from two investigators and one former employee, none of whom attended any of these meetings. Further, the Declaration of Cristian Cespedes ("Mr. Cespedes"), is not even signed and the Declaration of Daryl Davis-Ferra ("Mr. Davis-Ferra") contains an improper signature pursuant to LR IC 5-1. *See* ECF No. 4-4, p. 3; 4-6, p.8. Both declarations should be stricken pursuant to LR IC 7-1.

The only documentary evidence presented by Plaintiff is a letter sent in September of 2019, more than 6 months ago. Indeed, while UCI did issue a memo to employees at the end of September 2019, it did so because several employees were confused as to why the Department of Labor had visited worksites. **Ex. A**. Summerhays, Decl., ¶ 24. They were, among other things, concerned that the Department of Labor was investigating immigration status. *Id.* The letter referenced in Mr. Davis-Ferra's Declaration is in Spanish and is accompanied by an unverified, uncertified translation. Mr. Davis-Ferra's Declaration relies heavily on this inaccurate translation to claim, as fact, that the letter "attempted to deter workers from speaking with [investigators]." This misleading allegation is belied by an accurate translation of the September 2019 letter. **Exhibit G,** Declaration of Soledad Garcia ("Garcia Decl."), Exhibit 1. In fact, contrary to the

Department of Labor's assertion, the memo does not say that employees must "coordinate with their foremen." *Id.*; **Exhibit H**, Comparison Chart of Translations.[3] The memo does not imply that speaking with the DOL will lead to "immigration problems." *Id.* To the contrary, UCI specifically advised employees that the DOL investigators were *not* interested in immigration status to dispel concerns employees had brought to our attention after the DOL's initial visits. *Id.*

To the extent that the hearsay and double hearsay presented by the Plaintiff as "evidence" of intimidatory conduct requires rebuttal, a summary of the false allegations contained in the Applications and declarations in support follows:

- Mr. Cespedes claims he was a project manager in 2018 and began hiring workers with specific instructions from Mr. Summerhays on pay and overtime. ECF No. 4-4, ¶ 4. This is false. Cespedes was never responsible for negotiating rates or hiring employees. **Ex. A**, Summerhays Decl., ¶ 30. These functions were performed by Human Resources and Mr. Summerhays. *Id.* In addition, Mr. Cespedes has no firsthand knowledge of UCI's current operations, as he has not been employed by UCI since September of 2019. *Id.*

- Mr. Lama alleges workers told him that Mr. Summerhays visited a job site in September 2019 and told workers they should not speak to investigators. ECF No. 4-9, ¶ 8. Mr. Lama also, based on this hearsay, makes the inflammatory allegation[4] that Mr. Summerhays told employees that the investigators could "send information to immigration enforcement." This hearsay is inherently unreliable and false. Mr. Summerhays has neither instructed workers not to talk to investigators or stated that the investigators would send employee information to immigration enforcement. **Ex. A**, Summerhays Decl., ¶ 26; **Ex. C**, Perez Decl., ¶¶ 9-10; **Ex. D**, Romero Decl., ¶ 9.

---

[3] The emphasis included in this chart is that of counsel.

[4] These type of inflammatory allegations are relied upon by the Plaintiff through the Applications. They are advanced with little regard for the truth and no evidentiary support. Mr. Summerhays denies making any such statements. This is corroborated by the other witnesses whose statements Unforgettable was able to secure on short notice, prior to its full investigation of the allegations in the Complaint or submission of a responsive pleading.

• Mr. Lama alleges that "one worker" told him that Mr. Summerhays discussed the investigation at a December 2019 meeting and stated "he knew that some workers were leaking information." ECF No. 4-9, ¶ 9. This hearsay statement is false. **Ex. A**, Summerhays Decl., ¶ 27.

• Mr. Lama alleges workers were required to surrender their cell phones at a January 10, 2020 meeting "so workers were not able to record the meeting."  ECF No. 4-9, ¶ 10.  Mr. Lama alleges Mr. Summerhays again instructed workers not to give company information to investigators and to report their pay rates as $9 per hour if asked.  *Id.*  These hearsay statements are false and misleading.  Mr. Summerhays had all employees turn in their cell phones prior to the meeting to ensure that each employee gave his or her full attention to the annual meeting. **Ex. A**, Summerhays Decl., ¶ 28; **Ex. D**, Romero Decl., ¶ 4.   He was inspired to try this to increase engagement after observing performers use this technique to increase audience engagement at concerts. **Ex. A**, Summerhays Decl., ¶ 28. The meeting was focused on the future performance and direction of the company; at no time did Mr. Summerhays discuss the investigation or instruct employees on how to respond to inquiries from investigators. *Id.*

• Mr. Cespedes  and Mr. Davis-Ferra claim that payroll password were changed on January 28, 2020.  Mr. Cespedes and Mr. Davis-Ferra insinuate that the company purposefully "locked out" employees "so no one can see their paystubs without asking permission first."  ECF Nos. 4-4, ¶ 7; 4-6, ¶ 23. This is false. **Ex. A**, Summerhays Decl., ¶ 29.  UCI uses an ADP payroll platform and cannot "lock out" individual employee access. UCI performed a system-wide reset in January 2020 due to a security breach. *Id.* UCI advised all employees to reset their passwords and disseminated this information through slack and its foremen. *Id.* Employees can reset their passwords by calling ADP or using a link on their sign-in screens. *Id.*

• Mr. Lama alleges that, during a March 6, 2020 meeting, Mr. Summerhays again instructed workers how to respond to pay inquiries and "made it understood" that workers could not provide pay records to anyone and could be deported for participating in the investigation. ECF No. 4-9, ¶ 12.  These inflammatory, vague allegations are false. **Ex. A**, Summerhays Decl., ¶ 23.  Mr. Summerhays did not discuss the investigation at the March 6, 2020 meeting, nor did he reference or intimate that participation could result in problems with immigration. *Id.*   Ms.

Carrejo's Declaration corroborates Mr. Summerhays' denial. **Ex. F**, Carrejo Decl., ¶¶ 7-10. Had Mr. Summerhays made any statements regarding immigration or deportation, Ms. Crarejo certainly would have noticed and taken offense because she is of Mexican origin. *Id.*

- Mr. Davis-Ferra and Mr. Lama claim informants told him they were "threatened with a 30% pay cut and that anyone who disagreed was fired and could not come back." ECF No. 4-6, ¶ 24; 4-9 ¶ 13. As discussed extensively above, this is false.

- Mr. Davis-Ferra claims that one employee who spoke to him in October 2019 no longer wished to speak to one of the other investigators. ECF No. 4-6, ¶25. Mr. Davis-Ferra purports to infer, from this double hearsay (an unidentified person's refusal to talk to an unidentified other person), "what we heard about Mr. Summerhays intimidating witnesses…is true." *Id.* Inferences based on double hearsay are not evidence.

When viewed it its totality, Plaintiff's Application is devoid of any evidence of irreparable harm, and is entirely dependent on inference, hearsay, double hearsay, unsigned declarations, and a misleading documentary translation. Therefore, because there is no basis to grant the extremely broad and extraordinary relief requested by Plaintiff, Defendants request that this Court deny Plaintiff's Applications.

### III.    LEGAL ARGUMENT

#### A.   Legal Standard for Injunctive Relief

The Court should deny Plaintiff's preliminary injunction motion because it fails to meet the heavy burden required of such motions. "A preliminary injunction is an ***extraordinary*** remedy never awarded as of right." *Winter v. Natural Res. Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365 (2008) (emphasis added). Therefore, to qualify, "the movant's right to relief must be ***clear and unequivocal***." *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*, 698 F.3d 1295, 1301 (10th Cir. 2012) (emphasis added). A court may grant a preliminary injunction only if the movant establishes: (1) it will suffer irreparable harm; (2) that there is a substantial likelihood that it will succeed on the merits; (3) that an injunction, if issued, would not be adverse to public policy; and (4) that the threatened injury outweighs the damage the proposed injunction may

cause the opposing party. *Fernandez v. State of Nevada*, 2011 U.S. Dist. LEXIS 6103 at *2-3 (D. Nev Jan. 15, 2011 (citing Fed. R. Civ. P. 65; *Winter*, 55 U.S. 7).

Further, although a court may consider hearsay evidence when determining whether to issue injunctive relief, hearsay evidence alone is insufficient to satisfy Plaintiff's burden to obtain the extraordinary remedy sought here.  The legal authority cited by Plaintiff in support of its contention that this Court should rely on the hearsay and double hearsay presented in Plaintiff's Applications is misplaced and easily distinguishable.  For example, *Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009) is distinguishable from the instant matter because *Johnson* involved allegations of a breach of fiduciary duty related to the alleged diversion of $35 million in corporate assets—an issue wholly inapplicable in this situation.  *Id.*  Further, the *Johnson* court considered some hearsay *in conjunction with* "**the many exhibits, affidavits, declarations and factual allegations which have been submitted…by all parties...throughout the course of this litigation**."  *Id.* (emphasis added).  The court's decision in *Flynt Distributing Co. v. Harvey*, 734 F.2d 1389 (9th Cir. 1984) was based upon the urgency presented by allegations that the defendants were transferring valuable corporate assets.   In *Republic of Philippines v. Marcos*, 862 F.2d 1355 (9th Cir. 1988) (cited by *Johnson*, 572 F.3d at 1083, as authority for consideration of hearsay), the court was again faced with the urgency of the dissipation of corporate assets and noted "[n]o affidavits countering the inference were presented by [defendants]."  *Id.* at 1363.

Here, the bare hearsay and double hearsay relied upon by Plaintiff is supported by a solitary document from September 2019 which is in Spanish and accompanied by an uncertified, inaccurate translation.  This "evidence" is inherently unreliable and insufficient. It is contracted by the declarations presented by Defendants.  Plaintiff cannot meet any of the necessary elements to warrant the issuance of a temporary restraining order or preliminary injunction.  Plaintiff has also failed to provide any support, legal or factual, for their request that the Court prohibit Unforgettable from terminating employees or reducing wages in the midst of the worst economic downturn since the Great Recession, to require that Defendants produce documents prior to the commencement of discovery or the filing of a responsive pleading, to require that Defendants

allow employees to access to invade each other's privacy rights,[5] or its request for an award of fees and costs. As a result, Plaintiff's Applications should be denied.

### 1. Plaintiff is Unlikely to Succeed on the Merits of its Retaliation Claim.

Plaintiff has not produced any evidence indicating that it is likely to succeed on the underlying merits of its claims that Unforgettable is "engaging in a campaign to deter workers from cooperating with the Secretary" and the "Secretary is likely to succeed on his claim that Defendants interfered with his investigation." ECF No. 4-2 at 8:21-22, 13:23-24.

To establish a *prima facie* case of retaliation under the FLSA, Plaintiff must establish that an individual or group of individuals: (1) engaged in statutorily-protected activity, (2) suffered an adverse employment action, and (3) a causal connection exists between the two. *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000); *Lombardi v. Castro*, No. 15-55276, 2017 U.S. App. LEXIS 519, at *2 (9th Cir. Jan. 9, 2017). Assuming, *arguendo*, that Plaintiff can establish engagement in a protected activity, Plaintiff has utterly failed to produce any evidence that employees at Unforgettable suffered an adverse employment action or that a casual connection exists between the protected activity and any alleged adverse employment action.

### a. Plaintiff Has Presented No Evidence of Protected Activity

Claims of retaliation are necessarily individualized, personalized claims because they require proof of a causal connection between the activity and the adverse action. *See, e.g., Henderson*, 217 F.3d at 1240. Here, there is no evidence that any particular employee engaged in protected activity, let alone evidence connecting a particular employee who engaged in protected activity with a specific adverse action. Clearly, if the DOL claims to have documents it received from workers, some of those workers cooperated with the investigation and engaged in protected activity. But the fact that the Court can draw such an inference does not establish a prima facie

---

[5] Plaintiff requests, without qualification or limitation, that "employees shall also have the right to inspect Defendants' production records and payroll records." ECF No. 4, p. 2, ¶ 5. This asks the Court to endorse a blatant violation of employees' privacy right which exceeds permissible disclosure under Nevada law. Employees have a right to request their own records pursuant to NRS § 613.075.

1   case that is sufficient to meet a burden of proof and warrant the entry of a broad preliminary

2   injunction.

3             *b. Plaintiff Has Presented No Evidence of Adverse Action*

4      Notably, Plaintiff's allegations of an adverse action focus solely on the conduct of Mr.

5   Summerhays despite its sweeping allegation that the company is "engaging in **a campaign** to

6   deter workers." (emphasis added). Plaintiff's evidence of an adverse action is simple:

7   "Summerhays has engaged in a number of actions reasonably likely to deter employees from

8   engaging in protected activity." ECF No. 4-2 at 10:26-27.   Plaintiff points to the improperly

9   signed Declaration of Mr. Davis-Ferra to support this contention.   *Id.* As discussed above,

10  however, even if the Court were to refrain from striking the Declarations of Mr. Davis-Ferra and

11  Mr. Cespedes for noncompliance with the Local Rules, the contents thereof are nothing more than

12  hearsay, double hearsay, and inference.   Each allegation has been rebutted by Defendants herein.

13  *See* Section II above.

14     Plaintiff's suggestion that the requirement that employees enter into an employment

15  agreement is an "adverse action" is unsupported by any legal or factual authority. First, Plaintiff

16  provides no actual evidence that employees were "made" or "forced" to enter into employment

17  agreements. Second, the only legal authority cited by Plaintiff in support of its contention that

18  employment agreements are "coercive and obstructive" is misplaced.   In *Acosta v. Southwest Fuel*

19  *Mgmt.*, 2018 U.S. Dist. LEXIS 22554 (C.D. Cal. Feb. 2018), the court actually concluded that

20  "soliciting and extracting coerced **declarations**…constitutes an adverse employment action or

21  purposes of the FLSA's anti-retaliation provision.   *Id.* at *14 (emphasis added).   An employment

22  agreement is not a declaration.   It describes the contractual obligations of employer and employee

23  rather than   sworn statements made under the penalty of perjury.   As such, an employment

24  agreement is incapable of "causing [employees] to fear that their prior coerced signature or

25  statement could subsequently be used against [them to claim perjury]" as Plaintiff argues.   ECF

26  No. 4-2 at 11:7-11.

27     Critically, UCI did not terminate any employees in March of 2020.   The company merely

28  notified employees of a potential, company-wide reduction in discretionary bonus pay due the

worsening financial environment. Under Nevada law, companies may lawfully reduce wages with proper notice to its employees. *See* NRS § 608.100. A group of employees grew angry when the potential reduction was announced and walked off the job site. To the extent that these employees were confused and believed their employment was threatened, the Ninth Circuit has repeatedly reiterated, "the mere threat of termination does not constitute an adverse employment action." *Campbell-Thomson v. Cox Communs.*, 2010 U.S. Dist. LEXIS 43977, *18-19, (D. Ariz. 2010) (quoting *Hellman v. Weisberg,* 360 Fed. Appx. 776, 2009 U.S. App. LEXIS 28282 at*2 (9th Cir. Dec. 23, 2009)); *see also Hardage v. CBS Broad., Inc.,* 427 F.3d 1177, 1189 (9th Cir. 2005) (holding that thinly veiled threats were not enough to constitute retaliation under Title VII)). Each of the employees who walked off the job on March 18, 2020, remains on the company's payroll and is eligible to be scheduled for work, however not all employees are currently scheduled due to the economic downturn. UCI has provided substantial evidence regarding the legitimate business purpose for its decisions related to a potential pay reduction and scheduling in the current economic environment. Therefore, the Court "should not second guess an employer's exercise of its business judgment in making personnel decisions, as long as they are not discriminatory," *EEOC v. Republic Servs., Inc.* 640 F. Supp. 2d 1267, 1313, Nos. CV-S-04-1352 DAE(LRL); CV-S-04-1479-DAE(LRL) (D. Nev. 2009). Plaintiff's Applications, which seek to unjustifiably interfere with UCI's legitimate business operations, must be denied.

### c. Plaintiff Has Not Demonstrated the Requisite Causal Link

Plaintiff's Applications fail to cite the applicable standard for causation in the Ninth Circuit. In *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 133 S. Ct. 2517 (2013), the Court unequivocally held that the causation standard in retaliation claims is more rigorous than discrimination claims. *Id*. at 2530-33. Therefore, to establish the "causal link" – the third element of an employee's *prima facie* case – the employee must prove "the adverse actions would not have been taken 'but for' the protected activities." *Knickerbocker v. City of Stockton*, 81 F.3d 907, 911 (9th Cir. 1996); *McBurnie v. Prescott*, 511 F. App'x 624, 624 (9th Cir. 2013) (unpublished) (*citing Gross v. FBL Fin. Servs., Inc*., 577 U.S. 167 (2009); ); *Lombardi v. Castro*, No. 15-55276, 2017 U.S. App. LEXIS 519, at *2 (9th Cir. Jan. 9, 2017) (citation omitted)

("[t]he third element of a prima facie case requires showing 'but-for causation, not the lessened causation test stated in § 2000e-2(m),' which applies to discrimination claims"); *see Serlin v. The Alexander Dawson School*, No. 14-15937, 2016 U.S. App. LEXIS 13744, at *2 (9th Cir. July 28, 2016) (applying the but-for causation standard in assessing whether or not the plaintiff established a *prima facie* case); *T.B. v. San Diego Unified Sch. Dist.*, 806 F.3d 451, 473 (9th Cir. 2015), *cert. denied sub nom. San Diego Unified Sch. Dist. v. T.B.*, 136 S. Ct. 1679 (2016), (applying *Nassar*'s "but-for" standard to the plaintiff's *prima facie* case and concluding that there were "many explanations why the district" may have made the decisions it did and "[r]etaliation was not one of them").

The only possible adverse action supported by evidence, and admitted to by Defendants, is the announcement of a potential reduction in discretionary bonus pay for all UCI employees. Plaintiff cannot offer any evidence whatsoever to suggest, much less establish for the purposes of obtaining extraordinary relief, that the potential, *company-wide* pay reduction was motivated *solely* by a retaliatory animus against a nebulous group of employees. UCI has offered legitimate, non-discriminatory reasons for its announcement of a potential reduction in pay. Further, contrary to Plaintiff's allegation that Mr. Summerhays "first began firing workers," no employees were terminated. *Contra* ECF No. 4-2 at 13:1-2; [INSERT cite to DECL HERE]. Finally, even if an employee suffered an adverse action subsequent to the filing of the instant Complaint, "close temporal proximity alone is not enough to meet the heightened but-for-causation standard required of retaliation claims." *Lige v. Clark Cty.*, 2018 U.S. Dist. LEXIS 26479, *13 (D. Nev. 2018).

Plaintiff fails to point to any *applicable* legal authority in this jurisdiction in support of its assertion that "[d]district courts have granted TROs and **preliminary injunctions** to redress threats and actions similar to the ones that Mr. Summerhays has made in this case." ECF No. 4-2 at 13:6-7 (emphasis added). Plaintiff's extra-jurisdictional citations all involve cases where TROs were granted; none of these cases involve the analysis or award of a *preliminary injunction*. *See J&L Metal Polishing*, *Perez v. Stars Cleaning, Inc.*, No. 3:15-cv-1127, 2015 WL 11242006 (D. Or. June 26, 2014) (case settled after issuance of TRO); *Perez v. Alkanan, Inc..*, No. CV13-09228,

2013 WL 12129857 (C.D. Cal. 2013) (parties stipulated as to preliminary injunction); *Harris v. Oak Grove Cinemas, Inc.*, 2013 WL 3456563 (D. Or. May 2, 2013).   In contrast, Judge Pro denied a preliminary injunction where "Plaintiffs have presented no evidence that [a supervisor and coworker]…threatened or intimidated any…Plaintiff or putative class member. Consequently, Plaintiffs have not met their burden of establishing injunctive relief is necessary in this matter." *Almaraz v. Vision Drywall & Paint, LLC*, No. 2:11-cv-01983-PMP-PAL, 2012 U.S. Dist. LEXIS 51276, *5 (D. Nev. 2012).   Because Plaintiff has failed to put forward even a scintilla of evidence to establish the existence of any threatening conduct, let alone the requisite causal link, the Applications must be dismissed.

### 2.   Plaintiff Is Unlikely to Succeed on Its Claim of Interference

Plaintiff alleges Defendants violated the FLSA's investigatory provision by terminating employees, warning employees about immigration authorities, compelling employees to give "false sworn testimony" to investigators, sending "intimidating letters," "locking employees out" of the ADP payroll system, and "securing employee signatures on misleading employee contracts."   ECF No. 4-2 at 14:16-21. Plaintiff claims that the "evidence makes clear" that Plaintiff will succeed on the merits as to each of these allegations. *Id.* at 15:3.   However, as discussed above, the only "evidence" provided by Plaintiff is rife with hearsay, double hearsay, and latent inaccuracies. No employees were terminated.   Mr. Summerhays never told employees that they would be referred to immigration authorities if they spoke to investigators.   Plaintiff refers to "intimidating letters," but only provides a single letter from September 2019 which is inaccurately translated.   Plaintiff's claim that employees were "locked out" of ADP's online payroll platform is demonstrably false. Finally, Plaintiff provides no evidence of "misleading employee contracts."

Here, Plaintiff transparently attempts to unfairly gain an advantage in this case by use of improper tactics designed to manufacture a non-existent concern.   Plaintiff has not established a widespread violation of fairness. Rather, Plaintiff has (albeit inaccurately) described the contents of a single document sent more than 6 months ago and various hearsay, and double hearsay, statements regarding the purported intimidating conduct of Mr. Summerhays. Yet, Plaintiff's

broad-based remedy requested in their Applications reveal their true intent.  Instead of working with Defendants' counsel to address the alleged problem and allowing him sufficient time to address the various concerns raised (after he informed Plaintiff that no workers had been terminated), Plaintiff quickly filed the instant Applications before Defendants had an opportunity to fully respond.  Plaintiff should not be awarded for such tactics by receiving broad relief which inhibits the company's ability to respond to financial difficulties in the current economy or an aware of fees and cots related to this matter.  In fact, it is Defendants who has been forced to incur costs to respond to Plaintiff's embellished and distorted allegations.   Accordingly, this Court should deny Plaintiff's request for relief in its entirety.

### 3.   Plaintiff Has Not Demonstrated Irreparable Harm

"To constitute irreparable harm, an injury must be certain, great, and actual.  Irreparable harm cannot be speculative; the injury complained of must be of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Chem. Weapons Working Group, Inc. v. U.S. Dept. of the Army*, 963 F. Supp. 1083, 1095 (D. Utah 1997).  Further, "[s]imple monetary harm does not constitute an immediate threat of irreparable harm." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980).

While Plaintiff broadly alleges irreparable harm, Plaintiff fails to concretely explain how all Unforgettable employees will suffer harm or be unable to enforce their rights if injunctive relief is not granted. Plaintiff's allegations regarding monetary harm  (backpay and overtime owed to employees), if true, are capable of redress in the normal course. Again, Plaintiff has failed to produce a shred of evidence to support its baseless allegation that Defendants retaliated against and threatened employees. Further, Defendants has already provided the Notice attached as Exhibit A to Plaintiff's Applications to its employees via text and the Slack messaging system.

As noted above, Plaintiff's Applications are based entirely upon deficient declarations, which in turn are rife with hearsay and double hearsay.  There is no evidence of alleged threats or harm to any individual employees.   Moreover, Defendants have not terminated any employees or taken any further action since it announced the potential reduction in pay due to reduced profitability projections. Employees who are currently unscheduled due to the lack of work

available will be placed on the schedule as soon as work becomes available. Plaintiff's Applications are based purely on conjecture and speculation, which is an insufficient basis for obtaining the requested relief.  The only party that will suffer harm if this Court grants such broad, indiscriminate relief is Defendants, whose exercise of proper business judgment would be second guessed by the Court improperly sitting as a "super personnel department." *Chapman v. A1 Transp.*, 221 F.3d 1012, 1030 (11th Cir. 2000).  Further, if this Court were to prohibit or otherwise hamper Defendant's ability to manage its labor expenses, either through layoffs or a reduction in pay, it would improperly limit Defendants' ability to respond to the current financial crisis.  It would also endorse featherbedding by requiring Defendants to compensate employees when there is no work available to perform. *See, e.g.,  New Breed Leasing Corp. v. NLRB*, 111 F.3d 1460, 1471-1472 (9th Cir. 1997) ("the Board's pretense of "remedy" has produced an order that may make profitable production impossible. By approving this masquerade we preserve featherbedding, increase the risks of taking over foundering firms, and frustrate the revival of aging plants. Neither American workers nor American consumers will welcome this consequence.") Therefore, this Court should deny Plaintiff's request for injunctive relief.

### 4.   The Balance of Equities Do Not Weigh in Plaintiff's Favor

While this Court certainly has the authority and discretion to enter appropriate orders governing the conduct of parties, the Court must also weigh the need for any limitations or restrictions on Defendants' business operations in the midst of the severe economic crisis.

Here, the balance of the equities are not in Plaintiff's favor due the utter lack of evidence reflecting misleading, coercive, retaliatory, or otherwise improper communications by Defendants.  Further, at this stage in the litigation, there is no basis to limit Defendants' ability to respond to the economic crisis.  The court's analysis of the equities in *N. D. v. State Dep't of Educ.*, 600 F.3d 1104, 1113, 2010 U.S. App. LEXIS 6979, *17-18 (9th Cir. 2010) is instructive. There, the appellate court noted that the district court did not abuse its discretion when  it  found that it "could not say that the equities particularly tip in favor of the plaintiffs when the defendant school district was required to furlough employees. *Id.* The district court considered the money that would not have to be spent keeping the schools open and the layoffs that might need to occur

if the State did not implement the furloughs, against the harm to students caused by furloughs. *Id.* The district court concluded that furloughs were "the least bad of all the bad choices you can make." Similar, the equities do not weigh in Plaintiff's favor here such that Defendants should be indefinitely prevented from laying off employees or reducing wages when such actions could be necessary in order to keep its business open and financially sound.

### 5. An Injunction Does Not Serve the Public Interest

The scope of the injunction sought by Plaintiff is incredibly broad. Contrary to Plaintiff's assertion that it "seeks only an order to assure that Defendants will comply with the law," ECF No. 4-2 at 16:6-7, the relief requested by Plaintiff is overly broad. It applies to all employees of Defendant, without differentiation. It does not differentiate between any of the 4 named corporate defendants or any of the 3 named individual defendants. It asks the Court to sit as a "super personnel department" to scrutinize Defendants' legitimate business decisions. *See* ECF No. 4-2 at 17:1-4 ("Defendants must be restrained from implementing any termination or pay cut…so that the Secretary can bring any concern to this Court's attention prior to [implementation]."). It seeks to dictate the methods and means through which Defendants assign labor in an increasingly slow market. ECF No. 4-2 at 17:4 (requesting that Defendants provide employees less hours rather than reduce pay company-wide). It seeks the indiscriminate disclosure of Defendants' "production and payroll records" across all Defendant corporate entities to all employees. ECF No. 4-2 at 17:19-21. In light of the overbroad nature of the relief requested by Plaintiff, couple with the extremely weak evidence Plaintiff produced to support its request, the public interest would clearly not be served by the imposition of injunctive relief. The public's interest is best served by allowing parties to fairly engage in fact investigation and proceed to a trial on the merits. Plaintiff has failed to identify a legitimate reason why Defendants should be restrained from making reasoned decisions to maintain the company's financial health in the midst of the current economic crisis. Accordingly Plaintiff's requested relief should be denied.

/ / /

/ / /

/ / /

IV.     **CONCLUSION**

Based upon the foregoing, Defendants respectfully request that this Court deny Plaintiff's Applications for Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction.

Dated this 17th day of April 2020.

JACKSON LEWIS P.C.


/s/ *Paul T. Trimmer*
Paul T. Trimmer
Nevada State Bar No. 9291
Lynne K. McChrystal
Nevada State Bar No. 14739
900 S. Fourth Street, Suite 900
Las Vegas, Nevada 89101

*Attorneys for Defendants*